# United States Court of Appeals
### For the Eighth Circuit
_____

No. 25-2539
_____

United States of America

*Plaintiff - Appellee*

v.

Ronald Dickey Mason, also known as Ronald Dickie Mason

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Southern District of Iowa - Eastern
_____

Submitted: April 17, 2026
Filed: July 21, 2026
[Published]
_____

Before L.R. SMITH, BENTON, and ERICKSON, Circuit Judges.
_____

PER CURIAM.

Ronald Dickey Mason was charged with two drug offenses and one firearm offense. He pleaded guilty to the drug offenses but proceeded to trial on the firearm offense. A jury found him guilty. On appeal, Mason argues that there was

insufficient evidence to convict him. He also argues that the district court[1] plainly erred by allowing a government witness to refer to generic individuals who sold drugs as "bad guys." For the reasons discussed below, we affirm.

## I. *Background*

The government charged Mason with conspiracy to distribute a controlled substance, in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846; possession with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A); and carrying a firearm during and in relation to a drug trafficking crime, in violation of 21 U.S.C. § 851. He pleaded guilty to the drug offenses but proceeded to trial on the firearm charge.

At Mason's trial, before the parties gave their opening statements, the government read the indictment to the jury. The district court informed the jury that Mason pleaded guilty to the two drug counts.

Following opening statements, the government presented three witnesses: Special Agent Andy Ward of the Iowa Department of Narcotics, Investigator Wade Johnson of the Lee County Narcotics Task Force, and Special Agent Matthew Allers of the Iowa Department of Public Safety's Narcotics Enforcement Division. Agent Ward testified that he investigated Mason undercover. He told the jury that he witnessed Mason sell a confidential informant methamphetamine on one occasion and bought methamphetamine directly from Mason on multiple occasions. Agent Ward testified that these controlled buys took place in Keokuk, Riverside, and Burlington, Iowa. Agent Ward testified that Mason drove a red Toyota Camry to several of the controlled buys. He explained that during one of them, he picked up Mason at a repair shop where the red Camry was being serviced.

---

[1]The Honorable Rebecca Goodgame Ebinger, United States District Judge for the Southern District of Iowa.

During Agent Ward's direct examination, the government asked him about the safety precautions his team takes during controlled buys. He replied that they always had people on surveillance, had a rescue team on standby, designated people for the buy, and he always kept his gun on him. When asked why these safety precautions were needed, Ward said that "[i]t's just for the safety of everybody, safety for me, safety for the surveillance personnel, *safety for the bad guy, you know, or bad person I should say*, yeah." R. Doc. 149, at 29 (emphasis added). Mason's attorney did not object to Agent Ward's use of the phrases "bad guy" or "bad person," nor did the district court express any concerns regarding Agent Ward's testimony.

Agent Ward also testified that although he sat in the red Camry during some of the controlled buys, he never saw a firearm in the car. He explained that during methamphetamine purchases from Mason in the red Camry, he only looked at the front passenger seat where he sat. Agent Ward testified that when he was working undercover, he did not search the vehicle for a firearm or pat down Mason because "[t]hat would be weird." *Id.* at 40, 59. On cross-examination, Agent Ward testified that during the investigation, he had no information suggesting that Mason was known to be armed.

Mason's attorney cross-examined Agent Ward regarding Mason's connection to the red Camry. She elicited testimony that Mason drove a red pickup truck to one controlled buy with the confidential informant and that Agent Ward did not know who the red Camry was registered to. Additionally, Mason's attorney elicited testimony from Agent Ward that his conversations with Mason were "friendly" and Mason's demeanor was non-threatening. *Id.* at 49.

Next, the government called Investigator Johnson. He testified that his investigatory role with Mason consisted mostly of surveillance. Investigator Johnson also testified about the red Camry. He explained that he "was able to determine that [the red Camry] was [Mason's] main source of transportation" based on "doing

surveillance of . . . the prior controlled buys, doing surveillance of [Mason's] residence, [and] learning his pattern of life." *Id.* at 70.

Investigator Johnson told the jury that he obtained a search warrant for the red Camry after he learned that "Mason was going to be going [to St. Louis, Missouri,] and picking up a large sum of methamphetamine to bring back to Iowa to sell." *Id.* at 71. He testified that the Keokuk Police Department stopped Mason "[a]s soon as he crosse[d] over into Keokuk" and took Mason into custody for narcotics violations. *Id.* at 73. After towing the red Camry to a towing facility, law enforcement officers, including Investigator Johnson, executed the search warrant. Investigator Johnson explained that inside of the red Camry's trunk, the officers found a bag containing 9.5 pounds of methamphetamine in a cooler, several bags of methamphetamine inside of a suitcase, and a bag of methamphetamine inside of a backpack.

Next, Investigator Johnson testified that while searching the red Camry's cabin, the officers found a loaded firearm in the center console. He told the jury that the firearm "was located on the driver's side of the console" and "was affixed in such a way where the handle of the weapon was pointed up toward the top of the console, which . . . made [him] believe it was positioned that way for the driver to have access to" it. *Id.* at 85. During cross-examination, Mason's attorney elicited testimony that the "lab submission form that was sent back . . . indicated there [were] no [finger]prints located on the weapon." *Id.* at 87.

Lastly, the government called Agent Allers. He was not involved in the investigation but testified as an expert on drug trafficking and firearms investigations. Agent Allers testified about methamphetamine quantities, including the difference in quantities associated with distribution versus personal use; methamphetamine prices; and the use of firearms by drug traffickers. When asked why a drug trafficker might carry a firearm or have one accessible to him or her, Agent Allers explained:

I guess it's kind of in the name. If it's in the course of trafficking in illegal drugs, the activity itself is by nature illegal and criminal. Individuals who are involved are conducting business transactions. If there's issues, if there's problems during the course of transactions between these different people, these buyers and sellers, different individuals involved with the trafficking trade, they can't—they don't have any resource. They can't—they can't go to law enforcement and go to the police and say, well, I had a problem with this individual who might have shorted him on what he was supposed to get for his drugs.

And then, conversely, there is no civil action. They can't go and sue somebody if they feel they were shorted or they have an issue with somebody else that they've been conducting transactions with. And so what they have to do is they have to protect their assets, which is going to be their drugs and their money, and protect it from other criminals in the drug world, some of which may want to rob them or steal their drugs from them and/or money from them, and also just to protect themselves because there is violence that occurs in the illegal drug trade. So it's for self-protection as well.

*Id.* at 112–13. He also explained that when recovered firearms are sent to a crime lab, "it's more often than not we do not come back with fingerprints from items sent in for testing." *Id.* at 112.

Mason presented no witnesses nor did he testify. He moved for a judgment of acquittal, arguing that the government failed to present sufficient evidence to establish that he carried a firearm or that it related to drug trafficking. Mason also argued that the government failed to present evidence that the crime occurred in the Southern District of Iowa. The district court denied Mason's motion, and the case was submitted to the jury.

The jury found Mason guilty. Mason renewed his motion for judgment of acquittal in a post-trial motion. The district court, again, denied the motion. The district court entered a judgment indicating that Mason had been adjudicated guilty of the firearm offense. Mason appeals the district court's judgment.

-5-

## II. *Discussion*

On appeal, Mason argues that the district court erred when it denied his motion for judgment of acquittal and by allowing improper character testimony at trial. We affirm.

### A. *Sufficiency of the Evidence*

We review the district court's denial of a motion for judgment of acquittal de novo, viewing the evidence in the light most favorable to the jury's verdict and drawing all reasonable inferences in the government's favor. *United States v. Peters*, 462 F.3d 953, 957 (8th Cir. 2006). We will "uphold[] the conviction as long as there is an interpretation of the evidence that would allow a reasonable-minded jury to find the defendant guilty beyond a reasonable doubt." *Id.* (citation modified). "[W]e must uphold the jury's verdict even where the evidence rationally supports two conflicting hypotheses of guilt and innocence." *Id.* (citation modified).

Mason argues that the government failed to present sufficient evidence that he knew of the firearm in the center console or carried it during and in relation to a drug trafficking offense. However, a reasonable-minded jury could have found Mason guilty beyond a reasonable doubt after considering the evidence.

From the evidence presented at trial, a reasonable jury could have concluded that Mason knew of the loaded firearm based on its location in a car that he regularly drove. The jury heard testimony that the red Camry was Mason's "main source of transportation." R. Doc. 149, at 70. It also heard testimony that the officers discovered the firearm on the driver's side of the center console with the handle pointed up in a way that would allow the driver to access it.

Moreover, a reasonable jury could have concluded that Mason carried the firearm during and in relation to a drug trafficking offense. The "in furtherance of" element of the firearm offense "requires a slightly higher standard of participation than the language 'during and in relation to,' such that 'during and in relation to' is encompassed by the broader language 'in furtherance of.'" *United States v. Gamboa*,

439 F.3d 796, 810 (8th Cir. 2006). Here, the evidence presented at trial was even sufficient to support the more demanding "in furtherance of" standard which a "jury may infer . . . when the firearm is kept in close proximity to the drugs, it is quickly accessible, and there is expert testimony regarding the use of firearms in connection with drug trafficking." *United States v. Fetters*, 698 F.3d 653, 658 (8th Cir. 2012) (citation modified).

The jury heard testimony that Mason drove the red Camry to several controlled buys. Additionally, he was stopped by law enforcement while driving the vehicle back to Iowa from his methamphetamine supplier in St. Louis. It also heard testimony that not only did the officers' vehicle search uncover the loaded firearm, it also revealed several pounds of methamphetamine. Finally, the jury heard testimony from Agent Allers explaining that drug traffickers frequently carry firearms for multiple reasons, including self-protection as well as securing their money and merchandise. A reasonable-minded jury could have inferred that the firearm was carried in furtherance of drug trafficking based on the proximity of the firearm to drugs (in the same vehicle); its accessible position in the center console (driver's side, handle up); and Investigator Aller's expert testimony. While an innocent rationale for possessing the firearm is conceivable, the jury found the gun's purpose was otherwise. *See United States v. White Bull*, 646 F.3d 1082, 1089 (8th Cir. 2011) ("The question in a sufficiency-of-the-evidence challenge is not whether a reasonable jury could possibly conceive of an alternative interpretation of the evidence at trial.").

## B. *Character Evidence*

We review the admission of impermissible character evidence for plain error where the defendant did not object to the evidence at the time it was offered. *United States v. Abrams*, 108 F.3d 953, 955 (8th Cir. 1997).

> To obtain relief under a plain-error standard of review, the party seeking relief must show that there was an error, the error is clear or obvious under current law, the error affected the party's substantial

rights, and the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.

*United States v. Poitra*, 648 F.3d 884, 887 (8th Cir. 2011).

Mason argues that the district court plainly erred when it admitted Agent Ward's statement referring to drug traffickers as the "the bad guy" or "bad person." R. Doc. 149, at 29. He contends that these comments are inadmissible under Federal Rule of Evidence 404(a) which prohibits the admission of "[e]vidence of a person's character or character trait . . . to prove that on a particular occasion the person acted in accordance with the character or trait." Mason asserts that Agent Ward's statement serves no purpose other than to establish that he was a bad guy or bad person.

In support of his argument, Mason cites several cases. *See, e.g.*, *United States v. Cannon*, 88 F.3d 1495, 1502 (8th Cir. 1996) (concluding that the district court erred when it overruled the defendants' objection to the prosecutor's comments during closing argument referring to the defendants as "bad people"), *abrogated on other grounds by Watson v. United States*, 552 U.S. 74 (2007); *United States v. Sostarich*, 684 F.2d 606, 608 (8th Cir. 1982) (per curiam) (concluding that the district court erred when it refused to grant a mistrial when the government solicited testimony from a witness that the defendant had previously spent time in a penitentiary); *United States v. Mothershed*, 859 F.2d 585, 589–90 (8th Cir. 1988) (concluding that the district court erred when it allowed testimony of a defendant's prior conviction). However, none of these cases support reversing Mason's conviction for plain error.

The district court did not plainly err when it admitted Agent Ward's testimony because the testimony did not affect Mason's substantial rights. "The prejudicial effect of any improper testimony is determined by examining the context of the error and the strength of the evidence of the defendant's guilt." *United States v. Hollins*, 432 F.3d 809, 812 (8th Cir. 2005). Here, the context of Agent Ward's testimony

weighs in the government's favor. First, Agent Ward's comments differed from the comments at issue in Mason's cited cases. In those cases, the improper comments concerned the defendant specifically, whereas here the comments spoke of drug traffickers generally. Second, even without Agent Ward's comments, the jury knew that Mason engaged in drug-related criminal conduct. Indeed, before opening statements, the district court informed the jury that Mason pleaded guilty to two drug offenses. Third, although Agent Ward referred to drug traffickers as "bad guys" generally, he also specifically referred to his conversations with Mason as "friendly" and said Mason's demeanor was non-threatening. And finally, the evidence against Mason was strong. Particularly, it is undisputed that Mason drove from his drug supplier in St. Louis to Iowa with an easily accessible loaded firearm with several pounds of methamphetamine. *See United States v. Brown*, 702 F.3d 1060, 1066 (8th Cir. 2013) ("[A]lthough the strength of the evidence in this case was not overwhelming, it was not so weak that a single remark by the Government could reasonably have affected the jury's verdict."). Thus, even though Agent Ward's comments were reasonably objectionable, the district court did not plainly err in admitting them on this record. *See United States v. Cole*, 380 F.3d 422, 427 (8th Cir. 2004) (concluding that a witness's statement referring to the defendant's prior incarceration was objectionable but "not sufficient to create prejudicial error" given the strong evidence against the defendant).

## III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____